**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                   :
REGINA MARTINEZ-MATIAS,            :
                                   :
                                   :      Civil  Action No. 06-1716 (JAG)
          Plaintiff,               :
                                   :
              v.                   :           **OPINION**
                                   :
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
          Defendant.               :
_____:


**GREENAWAY, JR., U.S.D.J.**

### I.  INTRODUCTION

      Plaintiff Regina Martinez-Matias seeks review of the Commissioner of Social Security's

("Commissioner") denial of her application for Supplemental Security Income ("SSI") benefits,

pursuant to 42 U.S.C. §§ 1381a, 1382c(a)(3)(A), and 405(g).[1]  Plaintiff argues that the

Commissioner's decision is not supported by substantial evidence and should be reversed.  For

the reasons set forth in this Opinion, this Court finds that the Commissioner's decision is

supported by substantial evidence and should be affirmed.

_____

[1]42 U.S.C. § 1381a describes the state's obligations in administering a  financial assistance
program, which includes providing a hearing for a claimant whose application for benefits has
been denied.  42 U.S.C. § 1382c(a)(3)(A) defines disability within the Social Security Act.
42 U.S.C. § 405(g) provides that any individual may obtain a review of any final decision of the
Secretary of Health and Human Services ("Secretary") made subsequent to a hearing in which he
or she was a party.  The federal district court for the district in which the plaintiff resides is the
appropriate place to bring such an action.

## II. <u>PROCEDURAL HISTORY</u>

On October 18, 2000, Plaintiff filed an application for Supplemental Security Income under title XVI of the Social Security Act ("Act" or "the Act").  (Tr. 202.)  Plaintiff's alleged disability is a spinal injury that arose from a domestic dispute in which her ex-husband threw her out of a second story window.  (Tr. 316.)  Plaintiff's claim was denied on January 30, 2001.  (Tr. 152.)  Plaintiff filed a request for reconsideration on March 21, 2001, and the  Commissioner's original determination was upheld.  (Tr. 159.)  On September 24, 2001, Plaintiff filed a request for a hearing, which was scheduled for April 15, 2002.  (Tr. 163.)  On that day, Plaintiff appeared before United States Administrative Law Judge Ralph J. Muehlig ("ALJ Muehlig"). (Id.)  On April 23, 2002,  ALJ Muehlig found that Plaintiff was not disabled within the meaning of the Act, and upheld the Commissioner's denial of Plaintiff's claim.  (Tr. 134.)

Plaintiff filed a request for review of ALJ Muehlig's decision, and on February 14, 2003, the Appeals Council granted her request and remanded the matter.  (Tr. 181.)  The Appeals Council ordered the Administrative Law Judge to: (1) evaluate further Plaintiff's mental impairments in accordance with the special technique described in 20 C.F.R. § 416.920a; (2) give consideration to the opinions of treating physicians and explain the weight given to their opinions; (3) give further consideration to Plaintiff's maximum residual functional capacity and reference the basis of his determination in the record; and (4) obtain evidence from a vocational expert to clarify the effect of any assessed limitations.  (Tr. 181.)  On June 25, 2003, Plaintiff appeared before ALJ Muehlig again, and on July 18, 2003, he issued another unfavorable decision.  (Tr. 144.)

On August 22, 2003, Plaintiff requested review of ALJ Muehlig's second decision.  (Tr. 184.)  The Appeals Council granted Plaintiff's request.  (Tr. 189.)  The Appeals Council determined that the ALJ erred in finding that there was no evidence of psychiatric or psychological treatment since October 2001.  According to the Appeals Council, additional evidence submitted by Plaintiff suggested that Plaintiff had undergone some mental health treatment from February 2001 through July 2003.  (Id.)  The matter was remanded to Administrative Law Judge Gerald J. Ryan ("ALJ Ryan" or "the ALJ").

On June 21, 2005, Plaintiff appeared before ALJ Ryan.  (Tr. 30.)  On October 5, 2005, ALJ Ryan issued a decision, finding that Plaintiff had not been disabled at any time since October 18, 2003.  (Tr. 10.)  The ALJ found:

1.  The Claimant has not engaged in substantial gainful activity since October 18, 2000.

2.  The Claimant has lumbosacral disc disease that is "severe" within the meaning of the Act and regulations.  Although the Claimant has also had mental, cardiovascular, thyroid and /or migraine headache impairments, they have not been "severe".  The documented pelvis/right hip impairment was not of sufficient duration to be relevant in the present context.

3.  The Claimant's impairment or combination of impairments does not meet or equal any disorder in the Listing of Impairments in Appendix 1, Subpart P, Regulations No. 4.

4.  While the Claimant's impairments could reasonably be expected to produce some radiating back pain, depression, anxiety, and panic attacks, the disabling extent of symptoms alleged is not consistent with the evidence as a whole.  There is no documented medically determinable impairment that could reasonably be expected to produce persistent neck pain.

5.  The Claimant has retained the residual functional capacity for lifting and/or carrying up to 10 pounds occasionally, lifting and/or carrying very light objects such as docket files, ledgers and small tools frequently, standing and/or walking (with normal breaks) for a total of about 6 hours per 8-hour workday, sitting (with

normal breaks) for a total of about 6 hours per 8-hour workday, doing occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and performing all other basic work activities including the mental activities of understanding, remembering and carrying out simple instructions, making simple work-related decisions, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.

6.     The Claimant's maximum established residual functional capacity falls between the sedentary and light levels, as the Claimant cannot lift the weight required for the full range of light work, but can do standing/walking beyond what sedentary occupations require.

7.     The Claimant has no past relevant work.

8.     The Claimant is a younger individual, presently 40 years of age, with a limited education.

9.     The unskilled sedentary occupational base is not significantly compromised by the established postural limitations or mental impairments (Social Security Rulings 83-10, 85-15 and 96-9p).

10.    In accordance with the framework of medical-vocational rule 201.24 in Appendix 2, Subpart P, Regulations No. 4, as well as the vocational expert's testimony, the claimant is capable, in view of her residual functional capacity, age, education and lack of work experience, of performing jobs that exist in significant numbers in the economy.

11.    The Claimant has not been under a "disability" within the meaning of the Act at any time from October 18, 2000 through the date of this decision (20 C.F.R. § 416.920(g)).

(Tr. 25-26). On February 9, 2006, Plaintiff's request for review to the Appeals Council was denied. (Tr. 5.) Plaintiff then filed the instant action, seeking reversal of the Commissioner's decision, pursuant to 42 U.S.C. §§ 1381a, 1382c(a)(3)(A), and § 405(g).

### III.  STATEMENT OF FACTS

#### A.    Background

Plaintiff Regina Martinez-Matias was born on August 4, 1965, has a seventh grade education, and has no relevant work experience.  (Tr. 145.)  Plaintiff states that the onset of her physical disability was on June 29, 1997, when her ex-husband threw her out of a two-story window.  (Tr. 314, 316.)  Plaintiff contends that back pain from that injury brings tears to her eyes, and prevents her from standing for long periods.  (Id.)  The alleged pain prevents her from mopping, sweeping, and performing other household chores.  (Tr. 229.)  She further claims that the pain radiates to her legs.  (Id.)  Plaintiff also stated that a friend helps her carry all heavy items and helps her with laundry and cooking.  (Tr. 243-44.)  Plaintiff also states that she cannot drive for long periods of time because of the pain.  (Tr. 244.)  She also claims that she cannot take public transportation because of unavailable seating, difficulty in climbing up and down the bus steps, and back pain she suffers when the bus hits bumps.  (Id.)

In additional to her physical impairments, Plaintiff also claims to suffer from mental impairments.  She claims to have post-traumatic stress disorder (Tr. 371), and major depressive disorder (Tr. 392).  Plaintiff also claims to suffer from panic attacks and anxiety.  (Tr. 635.)

#### B.    Claimed Disabilities

Plaintiff claims that she is physically disabled by severe back pain from the injury she suffered when she was thrown from the second story window of a building.  Plaintiff was diagnosed with small central disc protrusion at L3-4, causing mild spinal stenosis, a small disc bulge at L4-5, and a small central disc protrusion at L5-S1, with bilateral neural foraminal.  (Tr. 267.)  Plaintiff also claims to suffer from mental disabilities that include post-traumatic stress

disorder (Tr. 371) and major depressive disorder (Tr. 392).  Plaintiff further contends that she

suffers from panic attacks, anxiety, and hallucinations.  ( Tr. 635.)  These alleged mental

disabilities purportedly trigger suicidal and homicidal thoughts.  (Tr. 111-12.)

**C**.      **Medical Evidence Considered by the ALJ**

       **1**.      **Physical Impairments**

           **a**.      ***University of Medicine and Dentistry of New Jersey***

Plaintiff received most of her medical care from doctors employed by, or affiliated with,

the University of Medicine and Dentistry of New Jersey ("University Hospital").

           **(i)      Plaintiff's Initial Emergency Room Visit**

On June 29, 1997, Plaintiff arrived in the emergency room of University of Medicine and

Dentistry of New Jersey ("University Hospital") for injuries resulting from falling from a two

story window.  (Tr. 316.)  On arrival, Plaintiff's primary complaint was pain in her left chest and

forehead.  (Id.)  A MRI of Plaintiff revealed that there were no gross fractures of the portable

pelvis and hips, left tibia, fibula-frontal or lateral, lumbar spine-frontal or lateral, or the thoracic

spine.  (Tr. 269.)  The MRI did reveal, however, that her trachea was deviated to the right.  (Id.)

A head CT revealed that she suffered no acute intracranial hemorrhage.  (Tr. 271.)

           **(ii)      Dr. Kathy Duncan**

Dr. Kathy Duncan appears to have been Plaintiff's primary physician at University

Hospital.  Based on a pelvic exam administered on Plaintiff on December 3, 1998, Dr. Duncan

opined that pelvic inflammatory disease could be the source of Plaintiff's pain in her left side.

(Tr. 304, 313.)

On December 30, 1999, Plaintiff sought treatment at University Hospital, complaining of "punching" pains that start in her back and radiate to her front thigh and knee.  (Tr. 292.)  It is unclear from the record whether Plaintiff saw Dr. Duncan, or another physician, on that date.

On March 21, 2000, Plaintiff sought treatment at University Hospital based on her complaints of right hip and back pain.  (Tr. 289.)  Dr. Duncan examined Plaintiff, and then referred her for additional treatment. (Id.)  On June 21, 2000, Plaintiff reported back pain to undesignated physicians at University Hospital, and on July 19, 2000, Plaintiff reported to Dr. Duncan that her back pain made her cry.  (Tr. 287.)

### (iii)  Physical Therapist Lisa Romanetz

On July 6, 1999, Dr. Duncan referred Plaintiff to physical therapy.  (Tr. 300.)  On August 30, 1999, at her initial visit with physical therapist Lisa Romanetz, Plaintiff complained of right sided low back pain that prevents her from seeking employment and doing household chores. (Tr. 429.)  After several sessions with Romanetz, Plaintiff was able to tolerate the activities at physical therapy, despite subjective complaints of pain. (Tr. 409.)  Although Plaintiff continued to complain of right-sided lower back pain, Romanetz could not identify any significant objective findings that could account for Plaintiff's alleged pain.  (Id.)

### b.  *Progressive Imaging Center*

Dr. Duncan referred Plaintiff to Progressive Imaging Center ("PIC") for examinations. On September 25, 2000, Dr. S. Karimi of PIC examined a MRI of Plaintiff, and found that she had a small disc protrusion at L3-4, which causes mild spinal stenosis, and a small central disc protrusion at L5-S1 with bilateral neural foraminal narrowing.  (Tr. 267.)  On that day, PIC

records indicate that Plaintiff suffered a panic attack that interfered with administering the MRI. (Tr. 277.)

On October 2, 2000, Dr. James Heiman examined a MRI of Plaintiff's back and hips, and found no intra-osseous, marrow pathology, or joint effusion.  (Tr. 265.)  Dr. Heiman also found no evidence of injury to Plaintiff's lower pelvis. (Id.)

On June 26, 2000, Dr. Karen Burger examined an x-ray of Plaintiff's cervical spine and right hip, and found that the cervical spine was normal and the right hip presented no evidence of fracture, dislocation, or degenerative disease.  (Tr. 312.)

### c.  *Dr. Michael Correa*

On July 7, 2003, Dr. Michael Correa completed a medical evaluation form detailing the treatment he provided to Plaintiff.  (Tr. 609.)  Dr. Correa diagnosed Plaintiff with symptoms of lower back and neck pain, depression, anxiety, and dizziness.  (Id.)  He also indicated that Plaintiff suffered from migraine headaches and hypertension.  (Id.)  Dr. Correa evaluated Plaintiff's physical limitations, and found that she could not lift or push more than five pounds. (Tr. 610.)  Dr. Correa also indicated that Plaintiff needed psychiatric evaluation.  (Id.)

### d.  *Dr. Mauricio Velasco*

On September 20, 2004, Dr. Mauricio Velasco referred Plaintiff to Progressive Medical Imaging for a MRI of her cervical spine.  (Tr. 614.)  The MRI report indicated that Plaintiff had degenerative disc disease from L3-L4 to L5-S1, and central posterior disc herniation at L5-S1. (Id.)

On June 20, 2005 Dr. Velasco completed a medical evaluation form detailing his treatment of Plaintiff. (Tr. 611.)  On the form, Dr. Velasco noted that Plaintiff displayed

symptoms of depression as well as back pain radiating to her extremities.  (Tr. 611.)  He also reported that a MRI he reviewed of Plaintiff's cervical spine was normal, but that she had disc herniation in her lower spine.  (Id.)  He prescribed Zoloft, Lipitor, and other pain medications to treat Plaintiff's symptoms.  (Id.)  Dr. Velasco ultimately opined that Plaintiff could engage in substantial gainful activity, if the job did not require heavy lifting or prolonged standing.  (Tr. 612.)

### 2.   Mental Impairments

#### a.   *University Hospital/University Behavioral Healthcare Center*

On December 1, 1999, Plaintiff went to University Hospital with cold symptoms.[2]  (Tr. 294.)  During her examination, Plaintiff reported that she was fearful that her ex-husband "was going to be downstairs," was afraid that he was at her home, and stated she had a restraining order against him.  (Tr. 293.)  The medical report also indicates that Plaintiff also stated she was nervous all of the time.  (Tr. 294.)

On May 15, 2001, Plaintiff attended a therapy session at University Hospital.  (Tr. 566.)  Plaintiff still complained of back pain, but added that her relationship with her boyfriend was improving, and that he had refrained from physical abuse and aggressive behavior.  (Id.)  The counselor indicated that Plaintiff reached the goals outlined in a predetermined treatment plan, but that she would benefit from additional counseling.  (Id.)

---

[2] The medical record does not indicate the name of the physician who treated Plaintiff on December 1, 1999.

In September 2001, Plaintiff made an unscheduled visit to University Behavioral Healthcare Center ("UBHC").[3]   (Tr. 568-69.)  The medical record indicates that Plaintiff seemed depressed and she had multiple bruises on her upper body, which she admitted were caused by her new boyfriend.  (Id.)  The medical records from her September 2001 visit also indicate that Plaintiff displayed symptoms of post-traumatic stress syndrome. (Id.)

> **b**.     ***Dr. Tin S. Chin***

On February 5, 2001, Dr. Tin S. Chin examined Plaintiff and diagnosed her with post-traumatic stress syndrome, explaining her symptoms as depression, reliving past experiences, fear for her life, and reoccurring nightmares.  (Tr. 371-72.)  Plaintiff also reported that her ex-husband abused her for three and a half years.  (Id.)  Plaintiff further stated that she was in a new relationship, and that her new partner is showing signs of abusive behavior.  (Tr. 372.)  Dr. Chin, along with social workers Ellen Crowley and Luis Hernandez, created a treatment plan that would allow her to overcome anxiety, depression, and self-esteem issues.  (Tr. 369.)

On October 9, 2001, Plaintiff went to the emergency room, where Dr. Chin examined her and reported that she alleged suicidal and homicidal thoughts about her boyfriend.  (Tr. 452.)  She also claimed to have auditory and visual hallucinations.  (Id.)  Dr. Chin prescribed Depokote for Plaintiff, and she was discharged that same day.  (Tr. 455.)[4]

---

[3]  It is unclear who examined Plaintiff in September 2001, but the record suggests that she met with a social worker.

[4]  Dr. Chin also referred Plaintiff to follow-up counseling with Dr. Bullock, and a session was scheduled for October 11, 2001.  (Id.)  It is unclear from the record whether Plaintiff attended this session.

c.      ***Group Therapy***

In December 2001, Plaintiff began group therapy sessions at UBHC.  (Tr. 549.)   Plaintiff participated in a six-week partial hospitalization program, during which she attended group therapy sessions throughout the day.  ( Tr. 528-549.)   Each group therapy session focused on a different topic, such as medication, education, or nutrition.  (Id.)  Although Plaintiff met with several therapists, Dr. Chin remained her primary psychiatrist.  (Tr. 548.)  Plaintiff was present for most sessions and actively participated in the group discussions.  (Id.)  At the close of most of Plaintiff's group therapy sessions, the counselors gave her a rating of five, which denotes the highest rating of participation.  (Id.)

d.      ***Dr. Gayathri Sastry***

On July 2, 2001, Plaintiff submitted to a mental status exam performed by Dr. Gayathri Sastry of UBHC.  (Tr. 394.)  During Dr. Sastry's exam, Plaintiff indicated that she had problems with sleeping, fatigue, poor appetite, and she often argued with her boyfriend.  (Tr. 388-89.)  Dr. Sastry noted that Plaintiff suffered from depressed mood, mood swings, and poor frustration tolerance.  (Id.) Plaintiff also admitted, during Dr. Sastry's examination, that when she is feeling frustrated, she feels like jumping out of a window or crashing her car into something, but that she does not do so because she wants to live for her children.  (Tr. 389.)  She also stated that her children were with family services, or with their father, and that she does not remember why they were taken from her custody.  (Id.)

In his report, Dr. Sastry noted Plaintiff's symptoms were so severe that they required "immediate pharmacotherapy."  (Tr. 391.)  Dr. Sastry prescribed Trivil to treat Plaintiff's mood

swings and agitation, and scheduled Plaintiff to attend additional therapy sessions during the next three months.  (Tr. 392.)

### d.    *Dr.  Georgina Fernandez*

On July 23, 2001, Plaintiff met with Dr. Georgina Fernandez.  (Tr. 563.)  During the session, Plaintiff stated that she had a life-long history of being subjected to violence, previously from her siblings, and later by her boyfriends.  (Id.)

On October 12, 2001, Plaintiff made an unscheduled visit to Dr. Fernandez.  (Tr. 557.) While there, she stated that she tried to kill herself, but that her son prevented it by taking the gun away.  (Id.)  She also stated that she was given medication, which calmed her down.  (Id.)

On March 21, 2002, Plaintiff met with Dr. Fernandez and discussed the problems she had with her boyfriend.  She also mentioned that she would be looking for part-time work.  (Tr. 518.)

Plaintiff met with Dr. Fernandez again on April 12, 2002.  (Tr. 517.)   They discussed Plaintiff's volatile relationship, and Plaintiff stated that she was willing to participate in a program to assist her with her relationship problems.  (Id.)

On August 5, 2002, Plaintiff saw Dr. Fernandez, and complained to her that she suffered from panic attacks, depression, and moodiness.  (Tr. 512.)  Plaintiff also mentioned that she was taking medication regularly, which helped alleviate her symptoms.  (Id.)

On January 3, 2003, after failing to attend therapy for two months, and neglecting to take her medication for one month, Plaintiff attended another therapy session with Dr. Fernandez.  (Tr. 477.)  Plaintiff told Dr. Fernandez that she had not attended therapy sessions because her brother died, and she had to go to Puerto Rico to attend the funeral.  (Id.)  She also stated she was having problems with her daughter and boyfriend, and financial problems concerning funeral costs.  (Tr.

477.)  Although she appeared agitated and tearful, Dr. Fernandez found that Plaintiff was well groomed, alert, oriented, and had good thought process.  (Id.)

On January 31, 2003, Plaintiff admitted to Dr. Fernandez that she has continuous fights with her boyfriend, which include physical altercations.  (Tr. 474.)  Plaintiff acknowledged her pattern of abusive relationships, but indicated she would remain in her current relationship.  (Id.)  Dr. Fernandez also noted that Plaintiff's medication was working well, except for the side effect of weight gain. (Id.)

On March 3, 2003, Plaintiff attended another therapy session with Dr. Fernandez.  (Tr. 481.)  During the session, Dr. Fernandez found that Plaintiff was stable and determined that Plaintiff's ongoing problems with her boyfriend account for all of her depressive episodes.  (Id.)  The treatment plan prescribed by Dr. Fernandez included education on how her domestic problems contribute to her mental illness.  (Id.)   Dr. Fernandez also encouraged Plaintiff to attend a domestic violence support group.  (Id.)

### e.  *Dr.  Elena Sarmiento*

On April 4, 2003, Plaintiff attended a therapy session with Dr. Elena Sarmiento.  (Tr. 472.)  During Dr. Sarmiento's examination, Plaintiff complained of increased shortness of breath and fear of death episodes that happen more often at night. (Id.)  Dr. Sarmiento prescribed Neurontin to treat Plaintiff's reported symptoms.  (Id.)

On April 25, 2003, Plaintiff attended another therapy session with Dr. Sarmiento in which she discussed problems with her boyfriend.  (Tr. 469.)  Plaintiff stated that there were fidelity issues and sexual problems in the relationship.  (Id.)  Dr. Sarmiento assessed that Plaintiff was

calmer than at her previous session, but remained preoccupied with her boyfriend and their relationship. (Id.)

On May 30, 2003, Plaintiff and her boyfriend attended a therapy session with Dr. Sarmiento. (Tr. 467.) The session focused on their relationship problems, such as Plaintiff's suspicions that her boyfriend was being unfaithful. (Id.) At the May 30, 2003 session, Plaintiff told Dr. Sarmiento that she sometimes forgot to take her medication, and that her current antidepressant medicine gave her headaches. (Id.) Dr. Sarmiento found that Plaintiff was anxious and had decreased attention span. (Id.)

### 3.   Examinations by State Doctors

On November 28, 2000, Dr. M.A. Mohit examined Plaintiff. (Tr. 355.) Dr. Mohit determined that Plaintiff had a limitation of flexion in her lower back, leg pain, and that she has an area of hyperesthesia over the right thigh, lateral aspect. (Tr. 356-57.) Dr. Mohit ultimately concluded that Plaintiff was not uncomfortable in the seated position during the interview, was in no acute distress, and could ambulate with minimal difficulty. (Tr. 356.)

On July 26, 2001, Plaintiff was examined by Dr. John M. Sawicki, D.O., of the Department of Labor. (Tr. 363.) Dr. Sawicki found that Plaintiff had lower back and neck pain, and had difficulty dressing and undressing. (Id.) Dr. Sawicki also noted that according to a University Hospital report created on May 8, 2001, Plaintiff met the criteria for post-traumatic stress disorder. (Id.)

14

**D.** **Plaintiff's Testimony at the Hearing Before the ALJ**

On June 21, 2005, Plaintiff appeared before ALJ Ryan for a hearing.  (Tr. 28.)  She

testified that she had anxiety attacks, but that they are infrequent, with the last one occurring a

week before the hearing.  (Tr. 54-55.)  Plaintiff also stated that she has difficulty

concentrating.  (Tr. 47.)  Plaintiff alleged that she suffers from depression and anxiety, but

that she takes medication that effectively relieves the symptoms of those conditions.  (Tr.47-

48.)  Plaintiff also testified that she has hallucinations and that she hears voices. (Tr. 50-51.)


**E.** **Testimony of Vocational Expert Rocco Meola**

Vocational Expert Rocco Meola also testified during the hearing before ALJ Ryan.

(Tr. 56.)  After confirming that Mr. Meola reviewed Plaintiff's medical records and that

Plaintiff had no past relevant work history, ALJ Ryan posed the following hypothetical:

> Assume that a claimant with the vocational profile as you've described it is
> limited to, basically, sedentary work as long as there is no heavy lifting, no
> repetitive bending, and no prolonged standing as far as physical is concerned
> and that with respect to  mental limitations that she, her restrictions of daily
> living are slight and maintaining social function, I would say, slight from the
> records I have seen....deficiencies of concentration in the seldom,...are there
> any jobs in the local or national economy a person like that could perform?"

(Id.)

Mr. Meola responded that Plaintiff could be an assembler, document preparer, scale operator, sorter, or ticketor.  (Tr. 58.)  The expert further stated that there are 2,000 of these types of jobs in the local economy and 70,000 in the national economy.  (Id.)

Plaintiff's attorney then questioned the expert and added additional factors to the hypothetical.  (Tr. 59.)  Plaintiff's attorney asked whether having problems with receiving criticism from a supervisor or other co-workers would affect her ability to do the jobs he had listed.  (Tr. 60.)  The expert responded that the inability to take criticism would prevent her from the performing the jobs.  (Id.)  Plaintiff's attorney then asked the vocational expert whether having 30 minute panic attacks two to three times a week would affect her ability to maintain employment in the relevant market.  (Id.)   Mr. Meola stated that those impairments "would not lend itself for her to work in a competitive labor market."  (Tr. 61.)

## IV. DISCUSSION

### A.    Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more

than a mere scintilla of evidence but may be less than a preponderance." Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59). The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision. See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981). Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; and (4) the claimant's educational background, work history and present age." Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence that may also support a different conclusion. Blalock, 483 F.2d at 775.

**B.     Statutory Standards**

The claimant bears the initial burden of establishing his or her disability. 42 U.S.C. § 423(d)(5). To qualify for DIB or SSI benefits, a claimant must first establish that he is needy

17

and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the Act if he is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Disability is predicated on whether a claimant's impairment is so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp.2d 302, 316 (D. Del. 2002).  Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

**C.**     **The Five-Step Evaluation Process And The Burden of Proof**

        Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[5]  20 C.F.R. § 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is

---

[5] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

not "disabled," and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

At step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. §§ 404.1520(a)(ii), (c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id. In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  Id.  If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment(s) meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit Court of Appeals found that to deny a claim at step three, the ALJ must specify which listings[6] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the court noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his

_____

[6] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

analysis.  Rather, the function of <u>Burnett</u> is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  (<u>Id.</u>)  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing." <u>Scatorchia v. Comm'r of Soc. Sec.</u>, 137 Fed. Appx. 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform his past relevant work, he will not be found disabled under the Act.  In <u>Burnett</u>, the Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

<u>Burnett</u>, 220 F.3d at 120.  If the claimant is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ

finds a significant number of jobs that the claimant can perform, the claimant will not be found disabled.  Id.

When the claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet his burden of establishing the existence of jobs in the national economy.  These guidelines dictate a result of "disabled" or "not disabled" according to combinations of vocational factors, i.e., age, education level, work history, and residual functional capacity.  These guidelines reflect the administrative notice taken of the number of jobs in the national economy that exist for a given combination of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When the vocational factors coincide with all the criteria of a rule, the rule directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458 (1983).  The claimant, however, may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, in the five-step process, "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  "The combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp.2d 360, 369 (D. Del. 2003).  The burden, however,

remains on the Plaintiff to prove that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 Fed. Appx. 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. June 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit Court of Appeals applies its procedural requirements, as well as its interpretation of Jones, to every step of the decision.  See e.g., Rivera v. Comm'r, No. 05-1351, 2006 U.S. App. LEXIS 2372, at *3 (3d Cir. Jan. 31, 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

**D**.     **ALJ Findings**

The ALJ applied the five-step sequential evaluation and determined that Plaintiff was not disabled within the meaning of the Act.  (Tr. 12.)  ALJ Ryan found that Plaintiff satisfied step one because she had not engaged in any gainful activity since October 18, 2000. (Tr. 13.)

ALJ Ryan then proceeded to step two of the sequential evaluation and found that the evidence established that Plaintiff had lumbosacral disc disease that has more than a minimal

impact on her ability to engage in gainful employment, and was severe enough to warrant further evaluation.  (Id.)

In step three of the evaluation, ALJ Ryan considered whether Plaintiff's impairments met or equaled the impairments in the listings.  (Id.)  ALJ Ryan evaluated Plaintiff's impairment under Section 1.04, which evaluates disorders of the spine.[7]  (Id.)  The ALJ noted Plaintiff's symptoms, abnormal MRI reports, and abnormal clinical findings, but ultimately found that the criteria in the listing were not satisfied.  (Id.)  The ALJ specifically found that Plaintiff had not presented with muscle weakness, atrophy, or spinal arachnoiditis.  (Tr. 13-14.)  He noted that a MRI report of Plaintiff's right hip revealed that Plaintiff had "no intraosseous or marrow pathology, no joint effusion, and no abnormalities of the visualized soft tissue structures, including parts of the uterus."  (Tr. 14.)  Rather, the ALJ determined that Plaintiff's subjective complaints of pain in her right hip, thigh, and pelvis were attributable to her bout with pelvic inflammatory disease.  (Id.)  Finally, the ALJ noted that there were no medical reports or findings to support Plaintiff's subjective claims of neck pain.  (Tr. 15.)

---

[7]Listing 1.04 provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

When considering the opinions of the state agency physicians, ALJ Ryan recognized their expertise and apparent lack of bias, but ultimately found their opinions could not be given substantial weight.  (Tr.  22.)  He found their opinions unpersuasive because the physicians either did not have access to material clinical or laboratory results when they rendered their opinions, or failed to acknowledge impairments that were reported by Plaintiff's treating and non-treating physicians.  (Id.)  He also gave less than substantial weight to the opinions of Plaintiff's treating physicians. (Tr. 23.)  Dr. Correa's opinion was less than substantial because the record did not indicate when, or how often, he examined Plaintiff.  (Id.)  Dr. Velasco's opinion was given less than substantial weight because he failed to cite any clinical findings in forming his opinion. (Id.)

After finding that Plaintiff's physical impairments did not meet the listing, the ALJ then evaluated Plaintiff's mental impairments.  (Id.)  The ALJ determined that Plaintiff's mental impairments are comparable to listing 12.04 (Affective Disorders), 12.06 (Anxiety Disorders), and 12.08 (Personality Disorders).  (Tr. 15.)  He noted that Plaintiff was diagnosed with Major Depressive Disorder, Recurrent, which presented with symptoms of depressed mood, mood swings, very poor sleep, poor frustration tolerance, poor appetite, and excess fatigue.  (Tr. 15.)  The ALJ evaluated the reports of Plaintiff's treating psychiatrists, Dr. Chin and Dr. Sastry, as well as reports from other clinicians who had treated Plaintiff at UBHC.  (Id.)

ALJ Ryan relied on Dr. Chin's findings that despite Plaintiff's symptoms, her cognitive functions appeared unimpaired and she had a normal attention span, average intelligence, and normal insight and judgment.  (Id.)  ALJ Ryan also noted that although Plaintiff had bouts of moodiness and depression, the impairments were manageable with medication and counseling.  (Tr. 19- 21.)  Although Plaintiff exhibited impairments that met the criteria of listings 12.04, 12.06, and 12.08, ALJ Ryan found that the impairments did not cause a marked restriction on Plaintiff's activities of daily living, social functioning, or her ability to maintain concentration, persistence or pace.  (Id.)  The ALJ also found that the medical reports in the record did not indicate that Plaintiff suffered repeated, extended episodes of decompensation, as she alleged.  (Tr. 16.)  The ALJ therefore concluded that Plaintiff did not meet Part B or Part C of the mental impairment listings.[8]  (Id.)      After

---

[8] Part B of Listing 12.04 provides that a claimant's mental impairment must result in at least two of the following restrictions:
    1. Marked restrictions of activities of daily living; or
    2. Marked difficulties on maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persisitence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration

Part C of Listing 12.04 requires the following to prove mental impairment:

    C.Medically documented history of chronic affective disorder of at least two year's duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychocosocial support, and one of the following:
        1.  Repeated episodes of decompensation, each of extened duration; or
        2. A residual disease process that has resulted in such a marginal adjustment that even a minimal increase in mental demands or change in the enviroment would be predicted to cause the invidual to decompensate; or
        3. Current history of 1 or more years' inability to function outside of a highly

determining that Plaintiff did not meet or equal any of the listings, the ALJ proceeded to step four to evaluate Plaintiff's residual functional capacity to perform work.  (Tr. 24.)  The ALJ previously noted that Plaintiff has no work history.  (Tr. 22.) Considering the record as a whole, he found that despite Plaintiff's physical and mental impairments, she was capable performing sedentary to light work, including lifting and carrying up to 10 pounds occasionally, or  frequently carrying very light objects, such as docket files, ledgers, or small tools.  (Tr. 24.)  He also found that she was capable of understanding simple instructions, making simple decisions, responding appropriately to co-workers and supervisors, and had the ability to cope with routine changes in a routine work setting.  (Id.)

In the fifth and final stage of the evaluation process, the ALJ assessed whether the Commissioner had met his burden of proving that there were a significant number of jobs in the local and national economy that are compatible with Plaintiff's established residual functional capacity.  (Tr. 25.)  Based on the framework in the medical vocational rule 201.24[9] and the testimony of the vocational expert, the ALJ determined that there were a significant

---

supportive living arrangement, with an indication of continued need for such arrangement.

Part B of Listing 12.06 and 12.08 are identical to Part B in Listing 12.04.  Part C of Listing 12.06 requires that a claimant's mental impairments must result in a complete inability to function independently outside the area of one's home in order to meet the criteria.
Unlike Listing 12.04 and 12.06, Listing 12.08 does not have a Part C section.

[9] 20 C.F.R. Part 404, Appendix 2 Subpart P.

number of jobs, including 2,000 locally and 70,000 nationally, that Plaintiff could perform. (Id.)

**E.**     **Analysis**

Plaintiff contends that the ALJ's decision should be reversed and that she should be awarded SSI benefits.  Plaintiff specifically argues that (1) the ALJ improperly supplanted the findings of objective medical evidence and relied on his own opinion and speculation in determining whether Plaintiff was disabled (Pl. Mem. of L. at 20-23); (2) the ALJ did not use the special technique to evaluate Plaintiff's mental impairments, as required by the Social Security Act (Pl. Mem. of L. at 23-27); (3) the ALJ failed to pose adequate hypothetical questions to the vocational expert (Pl. Mem. of L. at 27-30);  and (4) the ALJ's finding that Plaintiff's mental impairments did not meet the listing is not supported by substantial evidence (Pl. Mem. of L. at 30-33).

**1.**     ***Evaluation of Objective Medical Evidence***

Plaintiff first argues that the ALJ erred by disregarding the objective medical evidence of Plaintiff's severe mental illness and relying on his own speculative opinion to gauge the severity of the impairments.  (Pl. Mem.of L. at 20.)  Plaintiff also states that the ALJ relied on his unfounded opinion that Plaintiff made an allegation of mental impairment to bolster her chances of receiving benefits.  (Pl. Mem. of L. at 21-22.)  She contends that the ALJ "inappropriately and recklessly" stated that Plaintiff stayed in an abusive relationship because

she derived pleasure from it[10], and that he failed to analyze the complexity of domestic abuse and how it contributed to her mental impairment.  (Pl. Mem. of L. at 22.)

 Despite Plaintiff's contentions, the ALJ's finding that Plaintiff's mental impairments did not render her disabled during the relevant period is supported by substantial evidence in the record.   The ALJ considered that Plaintiff was diagnosed with post-traumatic stress disorder by Dr. Chin. (Tr. 15.) The ALJ noted, however, that Dr. Chin also observed that Plaintiff only seemed "somewhat depressed," and only appeared to be "a little anxious."  (Tr. 15.)  The ALJ also noted Dr. Chin's report that Plaintiff's cognitive functioning appeared unimpaired, that she had average intelligence, and that he found no symptoms of hallucinations, delusions, or suicidal thoughts.  (Tr. 18.)  The ALJ considered Plaintiff's participation in therapy at UBHC, and found that when she attended, she responded well to counseling and enjoyed the counseling programs because she it gave her somewhere go.  (Tr. 20.)   The ALJ also considered statements made during the June 2005 hearing, at which Plaintiff mentioned that she suffered from panic attacks, but stated that the panic attacks were manageable with medication.  (Tr. 48.)

---

[10]The ALJ, explaining why he found that Plaintiff had moderate difficulty in maintaining social functioning, stated, " while claimant reported that her relationship with her boyfriend was marred by frequent altercations, some of them physical, and while she allowed herself to continue in the relationship, the boyfriend's controlling, abusive nature, by her accounts, contributed significantly to the altercations, she had financial incentive to continue the relationship, she sometimes derived enjoyment from the relationship and the prospective of public benefits gave her considerable incentive to exaggerate whatever difficulties she genuinely had in the relationship."  (Tr. 28.)

ALJ Ryan reviewed and referenced Plaintiff's medical reports, Plaintiff's subjective complaints of pain, and her testimony at the hearing in presenting his conclusions.  All of the objective evidence  referenced provides supports that ALJ Ryan's decision was based on substantial evidence.[11]  This Court therefore rejects Plaintiff's appeal to the extent it is based on her contention that the ALJ's findings regarding the severity of her mental impairments are not supported by objective evidence.

---

[11] It is important to note that the ALJ's credibility assessment of Plaintiff may have been shaded by information not supported by the record.  The ALJ bases his credibility assessment of Plaintiff, in part, on the premise that she alleged suffering from mental impairment for the first time after she received notice that her initial application for benefits was denied. ( Tr. 18.) Contrary to ALJ Ryan's assumption, Plaintiff arguably demonstrated signs of mental impairment in December 1999.  On December  1, 1999, Plaintiff submitted to an examination and treatment for an infection.  (Tr. 294.)  During that time, she mentioned that she had a restraining order against her ex-husband which implies that the ex-husband is not living in the home.  (Id.)  She reported that she was worried that her husband was going to be downstairs or in the home and that she felt nervous all the time.  (Id.)  Even if the Plaintiff's fear that her husband would enter the home was based on her previous experience of him entering without permission, and not on bouts of paranoia, her statement about being nervous all the time suggests that she exhibited or reported at least minimal symptoms of mental impairment before she received the notice of denial of her initial application for benefits.

Furthermore, ALJ Ryan's misinformed credibility assessment of Plaintiff may have guided how he perceived other facts in the case, such as the effect domestic violence had on the relationship and Plaintiff's lack of work history.  Nevertheless, the reviewing court typically defers to the ALJ's findings of a claimant's credibility as long as there is a sufficient basis for the determination.  Izzo v. Comm'r of Soc. Sec., 186 Fed. Appx. 280, 287 (3d Cir. 2006).  As this Court has explained, ALJ Ryan considered all of the Plaintiff's medical records, along with her statements and demeanor at the hearing.  The information presented in the record is more than sufficient to support doubt of Plaintiff's credibility.  Even absent the misinformation concerning when Plaintiff first reported a mental impairment, the ALJ's conclusions about Plaintiff's credibility and her eligibility for benefits are plausible and supported by substantial evidence in the record.

**2.** ***ALJ Ryan Evaluated Plaintiff's Impairments  using the Special Technique***

Plaintiff next argues that ALJ Ryan, in evaluating Plaintiff's mental impairments, did not use the special technique required under the Act.  When evaluating mental impairments, the ALJ must apply a special technique to evaluate the symptoms of a claimant's medically determinable mental impairments and rate how these impairments limit their functionablity. 20 C.F.R. § 416.920a(b)(1).   Before the technique can be applied, the Plaintiff must submit medical records or laboratory results to prove that some mental impairment exists.  Id.  The ALJ must also give weight to the claimant's subjective complaints of mental impairments when they are supported by medical evidence.  Izzo, 186 Fed. Appx. at 285.  Once identified, the ALJ rates how these impairments affect the claimant, using four broad categories: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.  Id. at (c)(3).   The first three categories are rated on the following five-point scale: none, mild, moderate, marked, and extreme.  Id. at (c)(4).  The fourth area, episodes of decompensation, is rated on following four-point scale: none, one or two, three, four, or more.  Id.

Contrary to Plaintiff's assertions, the ALJ did apply the special technique set forth in the Act.  The ALJ concluded that Plaintiff's mental impairments resulted in mild restrictions of daily living, moderate difficulty in maintaining social functioning, mild difficulties in

maintaining concentration, persistence, and pace, and one possible period of decompensation. (Tr. 24.)  The ALJ went on to explain his decision with references from Plaintiff's medical reports and other documents in the record.  (Tr. 24, 23.)  He specifically found that Plaintiff had only mild restrictions in activity of daily living because she traveled to Puerto Rico in 2002 and 2003, enjoyed going to group counseling because it gave her somewhere to go, kept her driver's license current, and admitted to recently driving for short distances.  (Tr. 23.) The ALJ found that Plaintiff had only moderate difficulty in maintaining social functioning because although she exhibited some symptoms of mental impairments, during examinations she was cooperative, oriented, and related well to counselors or doctors.  (Id.)  He also noted that Plaintiff lived with her children in November 2000 and had telephone conversations with her children and other family members that reside in Puerto Rico.  (Id.)  The ALJ also found that the root of her problems with social functioning is the volatile relationship she has with her boyfriend.  (Tr. 24.)

The ALJ credits his mild rating of Plainitff's concentration, persistence and pace to her "intact cognitive functioning" at mental examinations, her ability to perform activities, and her travels to Puerto Rico, which were maintained all while still exhibiting symptoms of mental impairment. (Id.)  The ALJ recognized one possible episode of decompensation during October 2001 through January 2002, but determined that Plaintiff's self-reported suicidal and homicidal inclinations were not credible and did not rise to the level of  severity required by the Act. (Id.)

Given this comprehensive analysis of the factors for evaluating mental impairments set forth in the Act, Plaintiff's claim that ALJ Ryan did not apply the special technique is without merit, and cannot warrant vacation of his decision.

Plaintiff also alleges, assumingly in the alternative, that once ALJ Ryan found that Plaintiff had moderate difficulty maintaining social functioning, he had to provide specific references from the record to explain why Plaintiff's impairments did not meet the listings. (Pl. Mem. L. at 25. )  As stated above, the ALJ explained, with specific references to the record, why Plaintiff deserved the ratings rendered.  In addition, 20 C.F.R. 416.920a(d)(1), the regulation Plaintiff cites does not require the level of scrutiny that Plaintiff suggests.  Rather, the regulation cited by Plaintiff gives the ALJ guidance in determining when a mental impairment is not severe.[12]  Furthermore, Plaintiff cites no case law to support her claim that a higher level of analysis is required when a claimant has a moderate rating in functional capacity, and this Court can locate no authority supporting her position.

In sum, this Court concludes that the ALJ applied the special technique required by the Act, and his findings are supported by substantial evidence.

---

[12]  20 C.F.R. 416.920a(d)(1) states, "If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."

3.      *ALJ Ryan Did Not Fail to Pose a Proper Hypothetical*

Plaintiff also argues that ALJ Ryan posed a hypothetical that did not adequately reflect all of her impairments.  (Pl. Mem. L. at 27.)  Specifically, Plaintiff states that ALJ Ryan erred in not factoring panic attacks into the hypothetical.

It is well settled that a hypothetical question that does not reflect all of a claimant's physical and mental impairments that are supported by the record, it is not considered substantial evidence.  Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).  In addition, the ALJ must examine the claimant's medical reports in conjunction with their subjective complaints of pain or impairment. Izzo, 186 Fed. Appx. at 286.

On the other hand, the ALJ is required to only include evidence of those impairments that are supported by the record.  Churpcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  Furthermore, the ALJ may exclude impairments from the hypothetical that have been deemed so negligible that it would not prohibit the claimant from engaging in substantial gainful activity. Ramirez, 372 F.3d  at 555.

In this case, the ALJ considered all of the medical reports submitted in determining the severity of Plaintiff's mental impairment.  (Tr. 18-21.)  He then determined that the medical evidence did not support a finding that Plaintiff's mental impairments of depression, mood swings, poor frustration and argumentative behavior were disabling within the meaning of the Act.  (Tr. 26.)  In addition, the ALJ found that the severity of Plaintiff's subjective complaints

of mental impairment were not credible.[13]  (Tr. 18, 23.)  Therefore, the ALJ was not required to include these factors in the hypothetical to the vocational expert.

Furthermore, the ALJ did not err in not posing a hypothetical that included the Plaintiff having panic attacks occurring 2-3 times a week.  Plaintiff makes no reference to a medical report that states Plaintiff suffers from panic attacks of that frequency.  In addition, in her testimony before ALJ Ryan on June 21, 2005, Plaintiff testified that she did not know how often she suffered from panic attacks and that the attacks she had suffered were controllable with medication.  (Tr. 54-55.)

Even assuming that the ALJ should have included frequent panic attacks in the hypothetical, this defect was cured by Plaintiff's attorney.  After the ALJ posed the hypothetical to the vocational expert, Plaintiff's attorney posed a hypothetical that described a claimant that suffered from panic attacks 2-3 times a week.  (Tr. 59.)  The vocational expert found that these frequent panic attacks would prevent a claimant from being a competitive candidate in the job market. ( Id. )  Seeing that these statements were made on the record, the ALJ gave them adequate consideration and decided to adopt the hypothetical that best described Plaintiff's impairments. See  Jones, 364 F.3d at 507 (the ALJ was not required to accept the hypothetical posed by the claimant's counsel because he found that it was not

---

[13]  In examining Plaintiff's residual functional capacity, ALJ Ryan concluded, "The reports of hallucinations and suicidal or homicidal ideation occurred in the wake of arguments with her boyfriend and were of questionable veracity given her considerable incentive to exaggerate the difficulties she had in the relationship and the fact that they resolved very quickly when she was taken, or even referred, to the emergency room for evaluation/treatment, particularly when she felt she needed to be at the welfare office instead." (Tr. 23.)

supported by substantial evidence).  Therefore, the hypothetical posed by the ALJ is supported by substantial evidence in the record.

**4.**   ***The Commissioner Did not Err in Finding that Plaintiff's Depression and Anxiety Did Not Meet or Equal the Listings***

Plaintiff contends that the ALJ wrongly determined that she did not meet the mental impairments in  Listing 12.04 (Affective Disorders) and Listing 12.06(Anxiety Related Disorders).  (Pl. Mem. Of L. at  30.)  There are three parts to listing 12.04, and a claimant is considered disabled if she meets both Part A and Part B, or Part C.  20 C.F.R., Part  404, Subpart. P. Id.  Part A of Listing 12.04 is divided into three subparts.Id.   To satisfy Subpart A1, "Depressive Syndrome," a claimant must exhibit four of the nine symptoms listed.  Id. Subpart A2, "Manic Syndrome," is satisfied if a claimant exhibits three of the eight symptoms listed.  Id.  Subpart A3 is satisfied if the claimant has "Bipolar Syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)." Id.   A claimant will satisfy Part A if any of the subparts are satisfied. Id.

Plaintiff claims that she meets Part A1 because she exhibits anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, feelings of worthlessness, thoughts of suicide, and paranoid thinking. (PL. Mem. Of L. at  31.)  Plaintiff claims that she meets Part A2 because she has shown an increased need for sleep, involvement in activities that have a high probability of

painful consequences which are not recognized, and paranoid thinking.  (Id.)  Finally, Plaintiff claims Part A3 is met because she has manifested both manic and depressive syndromes.  (Pl. Mem. Of L. at  32.)

Plaintiff claims that she has also satisfied Part B in Listing 12.04.  Part B describes the severity of the impairments in Part A.[14]  A claimant must exhibit two of the following restrictions: "Marked restriction of activities of daily living, Marked difficulties in maintaining social functioning, Marked difficulties in maintaining concentration, persistence, or pace or Repeated episodes of decompensation, each of extended duration."  20 C.F.R., Part. 404, Subpart. P, Appendix. 1.  Plaintiff references reports from Dr. Chin and Dr. Sarmiento to support her contention that she has marked restrictions in her activities of daily living, and marked difficulties in maintaining social functioning.  (Id.)

The Commissioner argues that the record does not demonstrate that Plaintiff has an increased need for sleep. (Opp. Bf. at 12.)  The Commissioner also states that even if Part A of the listing is satisfied, Plaintiff does not meet the criteria of Part B. (Id.)  The Commissioner recognizes the Plaintiff is somewhat limited in the areas of social functioning and daily living, but only mildly so. (Id.)  The ALJ, explaining why he found that Plaintiff had moderate difficulty in maintaining social functioning, stated, " while claimant reported that her relationship with her boyfriend was marred by frequent altercations, some of them physical, and while she allowed herself to continue in the relationship, the boyfriend's

---

[14] See supra note 8 for a full description of Part B of Listing 12.04.

controlling, abusive nature, by her accounts, contributed significantly to the altercations, she had financial incentive to continue the relationship, she sometimes derived enjoyment from the relationship and the prospective of public benefits gave her considerable incentive to exaggerate whatever difficulties she genuinely had in the relationship." (Tr. 28.)

This Court agrees with ALJ Ryan that Plaintiff has not met Listing 12.04. As previously noted, ample evidence in the record contradicts Plaintiff's asserted limitations in conducting the activities of daily living and maintaining social functioning. (Tr. 24.) Even if this Court were to find that the record mandates a finding that Plaintiff meets the criteria listed in Part A, however, she still fails to meet the criteria in Part B. The medical reports of Dr. Chin and Dr. Sarmiento describe Plaintiff as having some of the symptoms that satisfy the criteria in Part A, but nowhere is it evidenced that Plaintiff had "marked restrictions" in the categories listed in Part B. Because the ALJ's finding that Plaintiff suffered from only mild restrictions on activities of daily living and moderate difficulty in maintaining social functioning is supported by substantial evidence in the record, the ALJ did not err in finding that Plaintiff did not meet the listing.

Finally, Plaintiff's claim that she meets Listing 12.06, "Anxiety Related Disorders," also must fail. Similar to Listing 12.04, Plaintiff must meet the criteria Part A and Part B or Part C to satisfy the listing. Plaintiff claims that she meets Part A3, i.e., where the impairment is "Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least

once a week." Part B of listing 12.04 is identical to Part B of listing 12.06 in that requires a claimant to exhibit marked restrictions in their functional capacity.    There is evidence that Plaintiff suffered from panic attacks, but again, there is no evidence that the attacks were so severe that they posed marked restrictions on Plaintiff's activities of daily living; social functioning; concentration, persistence or pace; nor is there evidence that they result in repeated episodes of decompensation.  Therefore, this Court affirms ALJ Ryan's finding that Plaintiff did not meet any of listings for mental impairments.

## IV.CONCLUSION

For the reasons stated above, this Court finds that the Commissioner's decision is supported by substantial evidence and is affirmed.


Dated: May 30, 2007                              _____s/ Joseph A. Greenaway, Jr._____
                                                 JOSEPH A. GREENAWAY, JR., U.S.D.J.